You'll notice that there are only three of us here today. Judge Holdridge and Judge Hudson had something that cannot be changed. But they will have the benefit of the tape recording. They will hear everything that we hear, and they will also be able to participate in the decision-making process. So they will be fully admonished or advised of what's taking place here, hear your tape recording of your arguments, and they will participate in the decision-making process. Would the clerk please call the first case? 211-0766, Chicago White Metal Casting v. Judge Kulig. Counsel, please. May it please the Court, Counsel, Elaine Newquist on behalf of the employer, Chicago White Metal Casting. We are all aware that an employee bears the burden of proving every element of his claim, and it is our contention that Mr. Kulig has failed to prove any element of this claim in this manner. He was a tenure employee of Chicago White Metal Casting, which is a light manufacturing operation. They use light metals, the zincs and the magnesiums. He assembles, he pulls parts from boxes. He places them into molds. He removes them about a minute later. He deburs them. He uses some air hoses, all performed at waist height. If we are to believe Mr. Kulig, and I should preface this by stating that even Arbitrator Lamy had some concerns about his credibility. The Arbitrator mentioned it and went through it and still found that there was merit to the proceeding. It's precisely Arbitrator Lamy's failure to understand exactly what Mr. Kulig did that will cause you to reverse this decision. Because he draws the conclusion that there is some element of Mr. Kulig's work that involves overhead work. And if you look at what all of the evidence, including Mr. Kulig's own testimony, establishes, the very most that he could possibly have done at or above chest height is remove one box from a stack of five. And that's if you believe his testimony that those boxes were stacked five high. The Respondent's witness and three of the Respondent's exhibits demonstrated that those boxes per OSHA requirements can only be stacked four high, thus at chest height and not at shoulder height. Even if we were to believe Mr. Kulig that he occasionally had to lift a box that was at that fifth level, by his own testimony the entire process would occur one in five times for seven to eight seconds. A majority, in fact, 99.9% of his work activity is performed at or below chest height. The only other possible activity he could demonstrate that was at or above chest height involved using what he called a 211 machine. And there was sufficient video evidence, substantial video evidence of a number of the machines that he had worked on. The evidence demonstrated that in the year preceding his claim date of accident of November 5th, 2005, he worked on that 211 machine two days out of 261. Tony Agrella, who was his coworker and supervisor, testified that even that machine does not require overhead work, because you stand on a platform to put the pieces in. So the bottom line is, unlike most of these cases where we're trying to sort through frequency and duration and exertion, there simply isn't overhead activities in this case. Now you look at the medical opinions. Dr. Lubin opines that he has a right shoulder injury because he does manual labor, never takes a history of what he does, never asks him any questions, never opines specifically as to what, if any, specific activities caused or contributed to the right shoulder condition. The doctor who does review those work activities, Dr. Pomeranz, concludes there simply isn't sufficient overhead work to cause or contribute to this condition in any way. Further, that the specific condition he's diagnosed with is not something that develops from a repredative trauma situation, rather from an acute trauma which there is simply no evidence of. What did the arbitrator mean when he said that it was undisputed that the claimant had worked on 23 different machines? There's no question but that the man had worked on a number of machines. But only one of them, the 211 machine, was higher than the chest or waist height. And that 211 machine was the one that he had only worked on for two days. And that 211 machine was the one that if he stood on the platform, which is frankly the only way you could access it, you would be at chest height and not overhead. Arbitrator Lamme simply misunderstood the evidence that he was presented with. I'm sorry. That's okay. There was disputed evidence about the amount of time he spent working at or above shoulder height, though. Correct. Is that correct? The claimant testified 20 percent of his time was spent doing that. Exactly. So why can't the commission decide to credit his testimony over other evidence? Because if you were to look at exactly what Mr. Kulig admitted that he did, there simply isn't evidence that that was 20 percent of any one of his work days. Other than saying it was. Well, but it's even better than that because you look at all of the machines, you look at what he admits to doing, and he's very, very detailed about how much time he spends, you know, working with these parts at waist height at the table, which is a majority of his job. He's very specific about putting these molds in and out of the machine. Again, somewhere between chest and waist height, not overhead. The only machine that he can point to that could potentially be overhead is the 211 machine, which he almost never uses, two days in the year before the accident. And, which Mr. Agrella says you don't access by reaching up, you access by reaching at this height because you're standing on a platform to get to the window that you've got to put the parts in. So there is no overhead. And then you look at the boxes. And he says, I have to go get a box and take it down and walk for seven seconds and put it on the table, and then I'm doing everything at my waist height again. That's if he's accurate that it's ever stacked at five high. And the respondent's witness and the respondent's evidence challenges that it ever is. And let's say he's telling the truth. Every now and then those boxes are stacked five high. All the time they're stacked five high. What percentage of his everyday job is that? Well, first of all, if he's working with five high, 20%. It would be 20% if it's one out of five. One out of five, but for seven seconds in an overall work day, maybe once or twice a day. And we're supposed to believe that that causes a right labral tear. And then look at what he tells the doctors. In one place he says the problems began in January of 2005. In August of 2005 he tells his employer he's having problems with the right shoulder that are not work-related, and as a result of which he doesn't want to work the Sunday shift anymore. He tells Dr. Levin the problems begin in October of 2005. He files an application alleging the incident occurred on November of 2005. The only connection with November 5, 2005 is that that's the day he goes to this doctor, the first doctor, who I won't even attempt to pronounce, but it's Polish and it begins with a B. And that doctor writes, work-related, right shoulder, full duty. Which, by the way, is also apparently the only notice that this employer is supposed to have, that this man has a right shoulder injury related to his work duties. He then continues working full duty until he goes off on group disability in February and has surgery. Was there something wrong with that notice that the employer got? What is that notice of? It doesn't specifically indicate what the condition is, what activity it's related to, and in fact it's on top of his already having told his supervisor, I've got a right shoulder problem, but it's not work-related, and that's back in August. So now what do we do? Then you look at the medical opinions. Dr. Levin, manual labor, manifesting in October of 2005. Contrast that with Dr. Pomerantz, who actually looks at what he does. And, you know, part of the reason that we collect all of this information and send it to a doctor is, I don't need to waste my client's time with you guys, and you don't need me to waste my time with you guys. I send all of the information to the doctor, the written job descriptions, the medical records, here's the patient, here are what he actually does, you tell me. And he says, that's not sufficient overhead work. We're not talking about an electrician. We're not talking about somebody who's doing this all day long. We've got somebody who does not do overhead work, and it is not sufficient to cause this significant condition, which, by the way, is usually as a result of an acute trauma. So where are we going? Further, I would argue that the permanent total disability award simply is not substantiated by the law. We know what the requirements are. The doctor says you cannot work at all. He's released to work. You make an effort to look for work, and you can't find a job. Mr. Kulig testified he never looked for work at all. The functional capacity evaluation says he cannot go back to medium-duty work. But it doesn't say he can't work. And his job wasn't medium-duty. It was actually lighter than that. Arbitrator Lamme seemed very persuaded by the fact that Mr. Kulig had an interpreter with him in court, which I would strongly encourage anyone for whom English is not a first language to utilize, because we're asking tough legal questions on direct and cross-examination. The man had worked for Chicago White Metal and communicated with every employee there in English for 10 years. For these reasons, we would ask that the arbitrator and commission's decisions be reversed. Most importantly, that you find, upon careful review of what this man actually did, that he did not do overhead work. And he certainly did not do overhead work to the 20 percent that would be required. That there is no accidental injury, and that there is no entitlement to any benefits, including having failed to prove entitlement to a permanent total disability. Did the respondent have a vocational assessment made? We did not, because he had no opinion that he was incapable of working. The FCE was ñ no, we did not. He was cleared to at least light duty. He made no effort to look for work, and light duty was actually his work level with this employer. Thank you. Counsel, please. May it please the Court, counsel, Patricia Lannan Cuss on behalf of Ludwig Kulig. Casting's argument in this case is that the petitioner did not prove accident, and that he didn't do enough overhead work in order to make a compensable injury. But if you look at the evidence in this case, there were 23 different machines that he worked on. Kulig testified that 60 percent of the machines were higher machines where he had to work at shoulder level. Forty percent were smaller machines. Now, granted, the 211 machine was a different type of machine where he had to go up on a platform, and that did require overhead work. But if you look at Dr. Pomerantz's report, Pomerantz says that if work is performed 17 percent of the time or more at or above shoulder level, then he could have sustained that injury to his shoulder. And Pomerantz is the respondent's IME? doctor in this case. In fact, if you look at the job description that was put out by casting, it acknowledges that the employees are required to do overhead lifting. And they said 17 percent of the time they do overhead lifting. Kulig estimated it to be 20 percent. So I think there was enough evidence there for the commission to conclude that the petitioner did in fact perform that type of work. But also, it's a matter of credibility here. It's a matter of looking at Agrella's testimony versus the testimony of Kulig. And Agrella didn't even know how tall he was. When I asked him on cross-examination, well, how tall are you? I don't know, 5'6", 5'9"? A reasonable person would know how tall they are. He was taller than Kulig. Kulig was only 5'2", 62 inches in height. So if you take a stack of four boxes, not even five, four, we have 80 inches in height. If you take five boxes and stack them up, you're now at 100 inches. So clearly, Kulig is going to be raising his arms more often than someone such as Agrella. And Agrella didn't even know about the box weights. Agrella testified that they couldn't weigh more than 15 pounds. And yet, by his own testimony, he said that some of the boxes would contain 440 parts of 3 to 4-ounce pieces. Well, if you do the math, that's over 82 pounds. So we're not necessarily talking about just working with very small parts at waist level. And this man worked for over 10 years at this company. The commission reviewed all of this evidence. They affirmed the decision of the arbitrator. It was well thought out. It was a credibility issue. It's certainly not against the manifest weight of the evidence. Now when we look at the flawed evidence according to Castine, it's not flawed. Kulig went in to see his doctor, Dr. Bogrovich, and he tells him that it's due to work. And Bogrovich writes down he has a work-related shoulder problem. And he takes that note back to Castine. And he gives it to someone named Brian. He was never called to testify. But Agrella admitted he saw that note a week later. Clearly they had noticed that this petitioner had a work-related injury involving his shoulder. And what's even more remarkable, the respondent in this case hired a company called GenX. And GenX did all kinds of rehab reports and were following the petitioner around. And to come now and claim, well, we didn't really know about this is absurd. They filed an accident report. Even the accident report claimed that Kulig was alleging that he injured his shoulder working on a CNC machine. He was a CNC machine operator. So I think as far as notice is concerned, clearly Castine had notice of the injury. I'm sure they're not happy with the fact that the commission made this man a permanent total disability. But they did nothing to try to take this man back to work after he had the surgery, after he had permanent restrictions. We hired a vocational expert. He did vocational testing. He said that the petitioner was unable to read for comprehension or spelling. He only had a fifth grade math education. He spoke broken English. He failed the citizenship test twice when he tried to take it. So I think the only question here is, is there a stable labor market? And there's not. According to this vocational expert, there is no stable labor market for this type of person who is now over 50 years of age at this point, speaks broken English, and has been a laborer all his life. He has limited trade experience. And the respondent took no action to do anything for this man to try to get him back to work, take him back with restrictions, hire their own vocational expert. When you look at all the evidence in this case, it's clearly not against the manifest weight of the evidence. And we're requesting that this court affirm the commission's decision. Thank you. Thank you, counsel. The court will take the matter under drive for disposition. And as I indicated, Justices Holdrege and Hudson will actively participate in the decision-making process.